**Opinion issued August 26, 2021.**



In The

# Court of Appeals

### For The

## First District of Texas

_____

### NO. 01-19-00738-CV

_____

## IN RE COMMITMENT OF MICHAEL PAGE SUMMERS

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Case No. 18-CV-1583**

---

## MEMORANDUM OPINION

The State filed a civil petition to commit appellant Michael Page Summers ("Summers") for involuntary treatment and supervision as a sexually violent predator.[1] After the jury found that Summers was a sexually violent predator, the trial court rendered a final judgment and an order of civil commitment. In four issues

---

[1] TEX. HEALTH & SAFETY CODE §§ 841.001–.153.

on appeal, Summers argues (1) the trial court abused its discretion by admitting testimony about an unadjudicated offense he allegedly committed against a one-year-old male, (2) the evidence is legally insufficient to support the jury's finding that he is a sexually violent predator, (3) the evidence is factually insufficient to support the jury's finding that he is a sexually violent predator, and (4) he is entitled to a new trial because the State made an improper argument in its closing argument to the jury.

We affirm the trial court's order of civil commitment.

## Civil Commitment of Sexually Violent Predators Act

In 1999, the Texas Legislature enacted the Civil Commitment of Sexually Violent Predators Act ("SVP Act"), which provides for the civil commitment of sexually violent predators based on legislative findings that "a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence." TEX. HEALTH & SAFETY CODE § 841.001. The Legislature expressly found that "a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state." *Id.*

The SVP Act defines a "sexually violent predator" as "a repeat sexually violent offender" who "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a). Behavioral abnormality "means a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

To begin a civil commitment procedure, the Texas Department of Criminal Justice ("Department") must notify an established multidisciplinary team of the anticipated release of a person serving a sentence for a sexually violent offense who "may be a repeat sexually violent offender." *Id.* § 841.021(a). The team must then (1) "assess whether the person is a repeat sexually violent offender and whether the person is likely to commit a sexually violent offense after release," (2) "give notice of that assessment" to the Department, and "(3) recommend the assessment of the person for a behavioral abnormality, as appropriate." *Id.* § 841.022(c). If the team recommends assessment of the person, the Department must use an expert to examine the person and "make a clinical assessment based on testing for psychopathy, a clinical interview, and other appropriate assessments and techniques." *Id.* § 841.023(a). Based on the assessment, if the Department determines "the person suffers from a behavioral abnormality," it must provide

3

timely notice of its assessment and corresponding documentation to the appropriate attorney representing the State. *Id.* § 841.023(b).

Upon receipt of the Department's assessment, the State attorney may file a civil commitment petition in the court of conviction for the person's most recent sexually violent offense alleging the person is a sexually violent predator. *Id.* § 841.041(a). If a judge or jury determines that the person is a sexually violent predator, the trial court must commit the person for treatment and supervision beginning on the date of release from prison and continuing "until the person's behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence." *Id.* § 841.081(a).

## Background

In June 2011, Summers pleaded guilty to the first-degree felony offense of aggravated sexual assault of a child and the second-degree felony offense of indecency with a child. He was sentenced to ten years' confinement for each offense, with sentences to run concurrently. In November 2018, before his release, the State petitioned to have Summers declared a sexually violent predator subject to civil commitment under the SVP Act. *See id.* § 841.081. The case proceeded to trial

and the jury heard from three witnesses: Summers and the State's two experts, Dr. Darrel Turner and Dr. Michael Arambula.[2]

## A. Summers

Summers, who was 44 years old at the time of trial, testified he was convicted of theft when he was 17 years old and placed on five years of probation for the offense. He did not complete his probation successfully because he was arrested for drinking and driving. Summers' probation was modified, requiring him to attend a 30-day inpatient alcohol treatment. After completing treatment, Summers was arrested again, this time for driving without a license. He served 120 days in prison as a "sort of a combination shock probation and substance abuse treatment."

After his release, Summers went to live with his sister and her four-year-old daughter, Katie, in Missouri.[3] In 1995, Summers was charged with one count of child molestation and four counts of statutory sodomy for Katie, and two counts of statutory sodomy for offending against six-year-old Carrie.[4] Summers was charged

---

[2]  "The person and the state are each entitled to an immediate examination of the person by an expert. All components of the examination must be completed not later than the 90th day before the date the trial begins." TEX. HEALTH & SAFETY CODE § 841.081.

[3]  We are using pseudonyms to protect the identities of the children involved in this appeal.

[4]  The record indicates that Carrie was "a relative of Mr. Summers' sister's boyfriend" and Dr. Turner refers to Carrie as one of Summers' nieces. Dr. Turner also testified that Carrie referred to Katie as her "sister" and a one-year-old boy, Jake, as their "brother."

with fondling Katie's vagina one time and fondling and penetrating Katie's anus using either his finger or an object. Summers was also charged with penetrating Carrie's vagina and anus with his finger more than once, including one time when Carrie was wearing a swimsuit.

These offenses were alleged to have occurred in 1995, when Summers was twenty years old. Although he pleaded guilty to the count of child molestation against Katie, Summers denied ever fondling Katie's anus or vagina or penetrating her anus with his finger and threatening to spank her if she told anyone. He also denied ever penetrating her anus with an object. Similarly, although Summers pleaded guilty to one count of statutory sodomy against Carrie, he denied ever penetrating Carrie's anus or vagina with his finger and telling her that he would spank her if she told anyone. Summers explained to the jury that he entered *Alford*[5] pleas in both cases, which allowed him to accept responsibility but not admit guilt. According to Summers, he accepted responsibility for "the accusations," but he denied any wrongdoing.

Summers was sentenced to five years' incarceration for each offense, to be served consecutively. Because he was still on probation for theft when he offended

---

[5] "An *Alford* guilty plea is a plea of guilty without admission of guilt." *Sewell v. State*, No. 14-15-00216-CR, 2016 WL 750059, at *3 (Tex. App.—Houston [14th Dist.] Feb. 25, 2016, no pet.) (mem. op., not designated for publication) (citing *North Carolina v. Alford*, 400 U.S. 25, 37 (1970)).

against Katie and Carrie, Summers' probation was revoked, and he received a seven-year prison sentence for that offense. While in prison, Summers was written up about 20 times for various disciplinary infractions including not obeying orders and testing positive for drugs.

Summers was released from prison in 2005, at which time he moved to the Houston area to live with his father. In 2011, Summers, a registered sex offender, pleaded guilty to committing one act of aggravated sexual assault against six-year-old Annie and indecency with a child against Annie's four-year-old sister, Kelly. Summers allegedly inserted his fingers into the girls' vaginas or anuses several times when he tossed them around a community swimming pool. Summers was sentenced to ten years' confinement for each offense, with sentences to run concurrently.

Summers was enrolled in a nine-month sex offender treatment program at the time of trial. Summers admitted to making mistakes in his life, including sexually offending against children. When asked how many child victims he had, Summers answered, "Definitely one." The prosecutor responded, "Just one?" Summers replied, "Well, I mean, I'm reluctant to incriminate myself on anything. I mean, I don't know what I'm going to be prosecuted for. I'm serving my sentence now for the stuff I pled guilty for." Summers admitted to touching Annie's vaginal area over her bathing suit one time but denied all other accusations.

7

Summers has received six disciplinary infractions during his time at the Department, including major infractions for refusing to accept a housing assignment and possession of marijuana. Summers testified that although he had used drugs and alcohol in prison at times, he has not done either in the last three years.

**B.    Dr. Darrel Turner**

Dr. Darrel Turner ("Dr. Turner") is a clinical psychologist. He testified that based on his education, training, experience, and the methodology he employed in this case, it is his expert opinion that Summers suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, which is one of the requirements for civil commitment under the SVP Act.

Turner began by discussing his qualifications to handle civil-commitment cases, including his doctoral education on the subject, his published research, his treatment of sex offenders, and his experience in performing over 200 behavioral-abnormality evaluations since 2013. Dr. Turner testified he employs a clinically adjusted actuarial approach when performing these evaluations. He explained that he begins his evaluations by reviewing the offender's records, including offense reports, court documents, victim statements, witness statements, penitentiary packets, legal court documents related to the convictions, and information concerning the offender's conduct during incarceration. He then interviews the offender, profiles the offender's personality traits, and scores two tests meant to

8

assess the offender's personality and statistical likelihood of reoffending. By evaluating the offender's test results, and then adjusting those results based on observations from the interview, Dr. Turner arrives at an opinion about whether the offender has a behavioral abnormality. Dr. Turner testified that this methodology follows his training as a forensic psychologist and accepted standards in the field of forensic psychology. Dr. Turner employed this methodology when he performed his assessment of Summers.

Dr. Turner testified that he reviewed over 1,200 pages of records and met with Summers twice, but "I've had a very limited opportunity to evaluate him because of his overall lack of participation." According to Dr. Turner, Summers refused to participate in the evaluation after learning the purpose of the interview at their initial meeting. Dr. Turner tried again about three months later and found Summers to be "abrasive" and "angry." Summers informed Dr. Turner that he did not find validity in psychology. He told Dr. Turner he felt the process was unfair because he had served his time, and that he was cooperating only because the judge had ordered him to cooperate. Summers then answered "no" to every question Dr. Turner asked.

### 1. Sexual Offending History

Dr. Turner testified that it was important for him to consider Summers' sexual offending history to determine whether he suffers from a behavioral abnormality because most of the risk factors and protective factors "will come from the details

9

of their sexual offenses. So it's very important that we look at them." According to Dr. Turner, Summers' first sexual convictions were for offenses he committed in Missouri in 1995 against his niece, four-year-old Katie, and six-year-old Carrie. Summers, who was living with his sister and Katie, was twenty years old at the time. Dr. Turner testified that although Summers was indicted for seven total counts against the two girls, Summers pleaded guilty only to one count of child molestation against Katie and one count of statutory sodomy against Carrie. Dr. Turner also noted that both were *Alford* pleas, meaning that Summers pleaded guilty to the charges but did not admit guilt. Dr. Turner testified that Summers has not accepted responsibility for these offenses and refused to talk to him about them during the interview. Dr. Turner explained the records revealed that Summers had penetrated Carrie's genitals and anus, digitally and with objects, and fondled Katie. According to Dr. Turner, Summers was on probation for another non-sexual offense when he offended against Katie and Carrie and his probation was revoked because of his guilty pleas in those cases. Summers was sentenced to two, five-year sentences, which ran concurrently.

When asked if there was anything in the records related to these offenses pertinent to his opinion that Summers suffers from a behavioral abnormality, Dr. Turner stated that Carrie "indicated that [Summers] also fondled her vagina and anal area" and that she saw him doing that to Katie and their one-year-old brother, Jake.

10

Summers' most recent sexual assault offenses occurred in Galveston County in August 2010 against six-year-old Annie and her four-year-old sister, Kelly. According to Dr. Turner, Summers, who was thirty-five at the time, was living in the Houston area with his father, and he was registered as a sex offender.

When asked if he had reviewed anything in the records concerning these offenses pertinent to his opinion that Summers suffers from a behavioral abnormality, Dr. Turner testified that Summers' friend (or girlfriend) claimed Summers would sit in her apartment and watch the community swimming pool across the street. She noted that if Summers saw Annie and Kelly at the pool, he would go over and play with them. As part of the "play," Summers would insert his finger in the girls' vaginas or buttocks while throwing them into the water. The girls reported this happening multiple times. The girls also claimed that Summers would have them put suntan lotion on his back, and told them to call him "Bobby," which was their mother's husband's name. He also told them that this was a secret and not to tell anyone.

### 2. Sexual Deviancy

Dr. Turner testified that sexual deviancy is a risk factor for reoffending and that Summers' sexual deviancy is pedophilia. He testified he diagnosed Summers with pedophilic disorder, nonexclusive type, and attracted to females. Pedophilic

11

disorder exists when an adult is attracted to a prepubescent child for at least six months and the child is at least five years younger than the adult.

According to Dr. Turner, pedophilic disorder is a chronic condition that Summers will have his entire life. Dr. Turner noted that Summers has convictions against four female children, "[s]o this is a sexual attraction to prepubescent in this case female children that lasts for—it's a pattern of sexual attraction to children. It's not just a onetime thing. You're seeing this over and over again in this person's life." Dr. Turner explained that his diagnoses were provisional because there was conflicting information in the record. Dr. Turner explained:

> So I wasn't really clear. For example, we didn't know—in the records it indicates that we had a 1-year-old male victim included in the Missouri victims. Yet that didn't seem to lead to a conviction. So we don't know whether or not he's attracted to prepubescent boys as well as prepubescent girls or not. We also don't know, because he has no history of being married, he has no history of living with anyone past a two-year period, we don't know if he's only attracted to children or if he's attracted [to] adults as well as children. So we don't know whether we can give him exclusive pedophilia or nonexclusive pedophilia. And that would have been the kind of information I would have gotten had we had our full evaluation. So I gave him pedophilic disorder because no matter what he does qualify as a pedophile. And I gave that as nonexclusive type attracted to females and I gave that provisionally so that as clinicians that work with him get more information they can make that more accurate.

On cross-examination, Dr. Turner testified that Summers was never charged with committing a sexual offense against Jake or any other male child. When asked

if there was evidence in the record that Summers had admitted to offending against a male child, Turner testified:

> That's a little tricky. There was a statement he made—I think it's on Page 192—where his statements were being summarized. And I believe it was parole made that document and they say that he explained that it was three victims including the male and that all of those were lumped into the charge and the deal that was made. So that was what was confusing to me

Dr. Turner also testified that from the records he reviewed, it was clear that law enforcement knew about the allegations that Summers had offended against Jake because that claim surfaced around the same time the allegations about Katie and Carrie emerged. According to Dr. Turner, a physician examined Katie, Carrie, and Jake and, unlike Katie and Carrie, there was no physical evidence of abuse for Jake.

### 3. Antisocial

Dr. Turner gave Summers a provisional diagnosis of antisocial personality disorder because while he believes Summers has an antisocial personality disorder, he could not make the diagnosis given Summers' lack of participation in the evaluation. Dr. Turner testified that having an antisocial personality disorder is a major risk factor for Summers. He described an antisocial individual as "an individual who doesn't do well in society" because he "has no real concern for society's rules" or "the welfare of others" or "the safety of other people," and is "self-oriented," "out for himself," and "doesn't mind manipulating, or conning, or controlling . . . or harming other people to get what he wants." Dr. Turner agreed

13

that it was "safe to say that a majority of prisoners show strong signs of antisocial personality disorder."

### 4.    Actuarial Instruments

As part of his assessment, Dr. Turner administered two tests to Summers, the Static-99R and the Psychopathy Checklist–Revised ("PCLR"). The Static-99R is an actuarial instrument that uses ten research-based, objective criteria to estimate a person's risk for reoffending, compared to other sex offenders, including prior non-sexual violence convictions, prior relationship status, prior sex convictions, prior sentencing dates, and relationships with victims. Each factor is individually scored, using positive or negative numbers. The higher a person's overall score is, the higher the person's risk is for reoffending, with the highest possible score being twelve. Dr. Turner explained that the Static-99R is "a starting point" that "allows us to compare that individual to other sex offenders and look at whether or not they're more likely or less likely than the average sex offender to be arrested or reconvicted for another sex offense."

Dr. Turner testified that Summers scored a 5 on the Static-99R taking into account the allegation that Summers sexually offended against Jake, a 1-year-old boy. Excluding that allegation, Summers scored a 4. A score of 4 or 5 places Summers in the above-average risk category for reoffending when compared to other sex offenders. Depending on his score (4 or 5), Summers is somewhere between 1.9

14

and 2.7 times more likely to reoffend than an average sex offender. When Summers was released from prison in 2005, his score would have been a 3. Thus, when Dr. Turner evaluated him, Summers was at a higher risk of reoffending than before.

The PCLR is an instrument that measures the degree of a person's psychopathy, using twenty of the most common personality traits among psychopaths to assign a number on a forty-point scale. Dr. Turner gave Summers a score of 31.1, which places Summers in the "severe range of psychopathy." According to Dr. Turner, he prorated the score because Summers refused to answer some questions. Dr. Turner testified that a range of 26 to 30 indicates a "high degree of psychopathy" and "31 through 40 means there's a severe range of psychopathy." Dr. Turner explained he gave Summers a high score for the following factors: grandiose sense of self-worth, pathological lying, lack of remorse or guilt, and callous lack of empathy. On cross-examination, Dr. Turner acknowledged that others in his profession use 30 as the cutoff for a prototypical psychopath.

### 5. Other Risk Factors

Dr. Turner explained that although Summers' pedophilic disorder and antisocial personality were the most significant risk factors for reoffending, there were other risk factors, among them the fact that Summers was intoxicated while committing his offenses, he repeatedly offended even when under supervision, and he had been punished. When asked if Summers understood why he offended, Dr.

Turner testified that he does not, and that this factor is "very important for his assessment." "If a person doesn't understand why they commit sex offenses, then there's very little chance of them getting out and being able to control their behaviors, especially when they've already shown an inability to control those behaviors."

The children involved in Summer's most recent offenses were unrelated to Summers, which increases his risk of future rearrest or conviction, according to Dr. Turner. Dr. Turner noted that Summers told the children "not to tell" and that they would get in trouble if they did so. He considered this request to keep matters secret as evidence of "grooming" of the victims, along with showing them attention. The presence of grooming is another risk factor for reoffending. Dr. Turner indicated Summers denied engaging in this behavior, continued using drugs, and reoffended while on drugs. He testified Summers' post-treatment drug use is evidence of a behavioral abnormality because it shows he has trouble controlling his behavior.

When asked if Summers had any protective or positive factors, Dr. Turner testified Summers had obtained his GED while in prison. He also testified that while he considered Summers' age to be "somewhat protective," this information did not change his opinion that Summers suffers from a behavioral abnormality because he reoffended when he was 35. Thus, "the age of 44 isn't as protective as it would be in other cases." Dr. Turner also noted that Summers was currently enrolled in a sex

offender treatment program in prison, and he believed this was the first such treatment Summers had received.

Based on Dr. Turner's education, training, experience, and evaluation of Summers, he concluded, based on a reasonable degree of scientific certainty, that Summers suffers from a behavioral abnormality that predisposes him to engage in a predatory act of sexual violence. Dr. Turner opined, "I think the makeup of Mr. Summers' behavioral abnormality is that he is quite antisocial. In fact, he's a severe psychopath who is also a pedophile. He's sexually attracted to very young girls, and he's willing to molest and threaten those girls even after being punished in order to satisfy his sexual urges. And that to me sounds like we're essentially reading the definition of a behavioral abnormality."

## C. Dr. Michael Arambula

Dr. Arambula concluded, based on his knowledge, skill, training, judgment, and experience, that Summers suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. After reviewing the records and meeting with Summers, Dr. Arambula diagnosed Summers with sexual deviance or pedophilia and unspecified personality disorder with some antisocial features. He also diagnosed Summers with an alcohol use disorder and cannabis use disorder but noted that both were in remission.

Dr. Arambula explained that someone who is antisocial shows a general unwillingness to follow social conventions and respect the rights of others; "they exploit people; they disregard laws; they're prone to get in trouble over and over." Dr. Arambula could not make a diagnosis of antisocial personality disorder because he lacked information showing Summers' criminal activity as a juvenile. When asked about the fact Dr. Turner gave Summers a score of 31.1 on the PCLR, Dr. Arambula stated he was "okay with it" but he did not see Summers as having as many antisocial features/psychopathy as Dr. Turner had found.

When Dr. Arambula was asked if there was any significance to the fact he diagnosed Summers with both a sexual deviancy and an antisocial-related personality disorder, Dr. Arambula stated that "the presence of sexual deviancy and the degree of antisocial personality are what the research are showing to carry the heaviest weight when looking at the risk factors in determining the severity of a person's sexual deviance and the risk of recidivism that they pose."

When asked to identify the risk factors that show Summers has a behavioral abnormality making him likely to engage in a predatory act of sexual violence, Dr. Arambula stated that Summers' sexual deviance is the primary contributor to his behavioral abnormality. That he has a history of "multiple acts and/or multiple victims substantially elevates the risks for recidivism," as well. Other risk factors for Summers include the antisocial features in his personality, his history of

recidivism despite serving time in prison, the young age of his victims, and his denial and minimization of his sexual offenses. Dr. Arambula explained: "Denial, minimization, in other words, when someone doesn't accept responsibility, then they're not able to manage it. So if they deny that it ever happened, then they're essentially blind to what they can do. So it tends to repeat. Much like somebody who has drug problems or alcohol problems and they have denial, it's that same sort of issue."

Dr. Arambula testified that Summers' drug and alcohol use are also risk factors because they lower the user's inhibitions and could "aggravate sexual deviancy that's underneath." Dr. Arambula compared Dr. Turner's Static-99 assessment to his own analysis and found it "a little bit low for [his] consideration." He recalled that Dr. Turner's score for Summers was a 5 but said that it would not surprise him to find out it might be a 4 and his opinion would not change based on that alone.

When asked if Summers had any protective factors, Dr. Arambula noted that Summers appeared to have a good home life, he had no history of sexual abuse or domestic violence, he had fairly steady employment, and he had a good support system in place for when he leaves prison. Dr. Arambula also testified Summers was "anxious and embarrassed" about discussing his offenses during their interview and being ashamed could suggest the presence of remorse.

## Admission of Evidence

In his first issue, Summers argues the trial court abused its discretion by allowing Dr. Turner to discuss the unadjudicated offense he allegedly committed against Jake, a one-year-old boy, because the evidence was more prejudicial than probative.[6]

### A. Standard of Review

We review evidentiary rulings using an abuse of discretion standard. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *In re Commitment of Stuteville*, 463 S.W.3d 543, 544 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (quoting *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000)). A trial court abuses its discretion when it acts without regard to guiding rules or principles. *Owens-Corning Fiberglas*, 972 S.W.2d at 43. We will uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Id.*

### B. Applicable Law

An expert in an SVP Act civil commitment proceeding may disclose details concerning the underlying facts or data upon which he relied to arrive at his opinion,

---

[6] Summers also argues the trial court abused its discretion by admitting this evidence because it was not relevant. *See* TEX. R. EVID. 401. Summers' relevance argument, however, is not before us on appeal because he did not raise it in the trial court. *See* TEX. R. APP. PROC. 33.1(a)(1).

including details of other sexual assaults even if those assaults are unadjudicated. *See In re Commitment of Stuteville*, 463 S.W.3d at 554–55; *see also In re Commitment of Talley*, 522 S.W.3d 742, 748–49 (Tex. App.—Houston [1st Dist.] 2017, no pet.). The expert's explanation of the facts upon which he relied and how those facts influenced his evaluation helps the jury weigh the expert's opinion that the offender has a behavioral abnormality—the ultimate issue the jury must determine. *See In re Commitment of Stuteville*, 463 S.W.3d at 555; *see also In re Commitment of Talley*, 522 S.W.3d at 748–49. The expert's disclosure of such evidence is subject to the same relevancy constraints governing the admission of other evidence. *See In re Commitment of Talley*, 522 S.W.3d at 748 (citing TEX. R. EVID. 403 & 705(d)); *In re Commitment of Farro*, No. 01-18-00164-CV, 2018 WL 6696567, at *10 (Tex. App.—Houston [1st Dist.] Dec. 20, 2018, pet. denied) (mem. op.).

Texas Rule of Evidence 403 provides relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. When conducting a Rule 403 analysis, a trial court must balance the inherent probative force of the evidence along with the proponent's need for that evidence against (1) any tendency of the evidence to suggest a decision on an improper basis, (2) any

21

tendency of the evidence to confuse or distract the jury from the main issues, (3) any tendency of the evidence to be given undue weight by a jury not equipped to evaluate the probative force of the evidence, and (4) the likelihood presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006); *see also In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.— Beaumont 2013, pet. denied).

## C. Analysis

Summers argues the evidence suggesting six-year-old Carrie saw him fondling one-year-old Jake is of minimal probative force because Summers was never charged with, much less convicted of, offending against Jake. He also argues that evidence of this unsubstantiated claim was unnecessary because there was ample evidence about the four sexual offenses involving Katie, Carrie, Annie, and Kelly for which he pleaded guilty.

This Court's prior opinion in *In re Commitment of Stuteville*, 463 S.W.3d 543 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) is instructive on this issue. In that case, the State's retained expert, Dr. Clayton, testified that although Stuteville had only been convicted of offending against four prepubescent girls in 2004:

> the police records and victim statements that she had reviewed indicated that Stuteville had committed many other offenses against many other victims beginning as early as 1987. Based on her review of the records, Dr. Clayton testified that Stuteville had somewhere

22

between twenty-seven and forty-three victims, including his own daughter and granddaughter. Dr. Clayton also testified that several of the girls reported to law enforcement that Stuteville had told them that he had "43 adopted daughters." According to Dr. Clayton, this number referred to Stuteville's count of the girls he had sexually assaulted.

*Id.* at 548. Stuteville objected to Dr. Clayton's testimony based on hearsay, also arguing the evidence was more prejudicial than probative under Rules of Evidence 403 and 705(d). "Dr. Clayton testified that sexual deviancy is one risk factor for reoffending and that the facts of Stuteville's offenses [were] important in explaining his particular sexual deviancy (pedophilia) and helping both her and the jury understand the depth and breadth of the acts he committed while acting out on his sexual deviancy." *Id.* at 556. The trial court overruled the objections and gave the jury a contemporaneous limiting instruction.

On appeal, Stuteville argued that Dr. Clayton's testimony "was based largely on unsubstantiated rumors, gossip, and multiple levels of hearsay, and that '[t]he sheer volume of this evidence created a substantial danger' that the jury based its verdict on further punishing Stuteville for the uncharged sexual offenses." *Id.* at 555. Rejecting Stuteville's argument, we explained that in civil commitment cases, evidence of prior uncharged sexual offenses upon which an expert relies, and the details of such offenses, are "highly probative and helpful to the jury in explaining the basis of [the expert's] opinion that [a person] has a behavioral abnormality that

23

makes him likely to engage in a predatory act of sexual violence." We thus held that:

> the trial court could have reasonably concluded that the facts and details related to Stuteville's offenses would be helpful to the jury in weighing his testimony and Dr. Clayton's testimony, and in explaining the basis for Dr. Clayton's opinion that Stuteville suffers from a behavioral abnormality. Given the purpose for admitting this evidence and the trial court's limiting instructions, we hold that the trial court did not abuse its discretion by admitting evidence of uncharged offenses.

*Id.* at 556.

We reach the same conclusion here. Although Dr. Arambula did not mention the allegation involving Jake specifically or appear to have considered this information when forming his opinion that Summers suffers from a behavioral abnormality, Dr. Turner did consider the information in diagnosing Summers with pedophilic disorder, nonexclusive type, and attracted to females. Both experts noted that the number of victims and their gender is important information they consider when assessing whether an offender has a behavioral abnormality.

Dr. Turner testified that sexual deviancy is one risk factor for reoffending and that uncharged offenses involving Summers, including Carrie's allegation that he fondled Jake, help explain his particular sexual deviancy (pedophilia). It also explains, in part, why he made provisional diagnoses. Dr. Turner explained:

> So I wasn't really clear. For example, we didn't know—in the records it indicates that we had a 1-year-old male victim included in the Missouri victims. Yet that didn't seem to lead to a conviction. So we don't know whether or not he's attracted to prepubescent boys as well

24

as prepubescent girls or not. We also don't know, because he has no history of being married, he has no history of living with anyone past a two-year period, we don't know if he's only attracted to children or if he's attracted [to] adults as well as children. So we don't know whether we can give him exclusive pedophilia or nonexclusive pedophilia. And that would have been the kind of information I would have gotten had we had our full evaluation. So I gave him pedophilic disorder because no matter what he does qualify as a pedophile. And I gave that as nonexclusive type attracted to females and I gave that provisionally so that as clinicians that work with him get more information they can make that more accurate.

Summer argues that the "tendency of th[is] evidence to suggest a decision on an improper basis" is evident because "a mere accusation, that was not considered worthy of meriting a formal charge, should not be used as support for indefinitely confining a person." But experts routinely use allegations, such as the one here, when conducting a behavioral abnormality assessment. *See id.* at 556 (holding trial court did not abuse its discretion by admitting evidence of uncharged sexual offenses allegedly perpetrated against 27 to 43 other victims).

Moreover, at Summers' request, the trial court gave the following limiting instruction :

> Hearsay is a statement made by a person at some time other than while testifying at the current trial or hearing which a party offers into evidence to prove the truth of the matter asserted in the statement. Generally hearsay is not admissible as evidence during trial. However, in this case certain hearsay information contained in records was reviewed and relied upon by experts and will be presented to you through that expert's testimony. Such hearsay evidence is being presented to you only for the purpose of showing the basis of the expert's opinion and cannot be considered as evidence to prove the truth of the matter asserted. You may not consider this hearsay information

25

for any other purpose including whether the facts alleged in the records are true.

The trial court also included the following limiting instruction in the jury charge:

> Hearsay is a statement that: 1) the declarant does not make while testifying at the current trial or hearing and 2) a party offers in evidence to prove the truth of the matter asserted in the statement. Hearsay normally is not admissible. In this case, certain hearsay information contained in records, including information regarding alleged offenses for which the Respondent was accused but not convicted of were reviewed by an expert or experts was admitted before you through expert testimony. Such hearsay was admitted only for the purpose of showing the basis of the expert's opinion and cannot be considered as evidence to prove the truth of the matter asserted.

Limiting instructions such as these serve to mitigate the potential improper use of evidence, including any tendency to place "undue weight" on the evidence "by a jury that has not been equipped to evaluate the probative force of the evidence." *See In re Commitment of Day*, 342 S.W.3d 193, 199 (Tex. App.—Beaumont 2011, pet. denied) (stating that when trial court gives jury limiting instruction, courts presume jury followed it).

Concerning the tendency of the evidence "to confuse or distract the jury from the main issues," the key issue at trial was whether Summers has a behavioral abnormality. The unadjudicated offense against Jake is evidence Dr. Turner relied upon when formulating his opinion on this very issue. Finally, as it concerns the last Rule 403 factor, how long it took to develop the evidence, Summers admits that the amount was relatively de minimis.

26

On this record, we cannot say the trial court abused its discretion by concluding that the probative value of the challenged evidence was not substantially outweighed by the danger of unfair prejudice. *See In re Commitment of Stuteville*, 463 S.W.3d at 555 (rejecting challenge to admission of uncharged offenses under Rule 403 in SPV Act case); *In re Commitment of Winkle*, 434 S.W.3d 300, 309 (Tex. App.—Beaumont 2014, pet. denied) ("While Rule 403 of the Rules of Evidence allows the exclusion of relevant evidence on special grounds, it should be used sparingly.").

We overrule Summers' first issue.

### Sufficiency of the Evidence

The jury found Summers is a sexually violent predator beyond a reasonable doubt. To reach its verdict, the jury had to find that (1) Summers is a repeat sexually violent offender who (2) suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. TEX. HEALTH & SAFETY CODE § 841.003(a).

In his second and third issues, Summers argues the evidence is legally and factually insufficient to support the jury's finding that he suffers from the requisite behavioral abnormality. Summers argues the only evidence supporting the finding that he has a behavioral abnormality consists of Dr. Turner's and Dr. Arambula's conclusory opinions, and conclusory opinions "amount to no evidence."

27

**A.     Standard of Review**

A commitment proceeding under the SVP Act is a civil proceeding that incorporates the standard of proof "beyond a reasonable doubt" typically reserved for criminal cases. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020) (explaining that proceeding under SVP Act is "rare civil case in which the burden of proof is beyond a reasonable doubt"). Thus, in reviewing verdicts in SVP cases for legal sufficiency of the evidence, we use the appellate standard of review applied in criminal cases. *In re Commitment of Stoddard*, 619 S.W.3d at 675; *see also In re Commitment of Stuteville*, 463 S.W.3d at 551 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Under the legal-sufficiency standard in criminal cases, we assess the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find, beyond a reasonable doubt, the elements required for commitment under the SVP Act. *In re Commitment of Stoddard*, 619 S.W.3d at 675; *see also In re Commitment of Stuteville*, 463 S.W.3d at 551. "It is the fact finder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts." *In re Commitment of Stuteville*, 463 S.W.3d at 551; *see In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.— Beaumont 2002, pet. denied) (stating fact finder may resolve conflicts and

28

contradictions in evidence "by believing all, part, or none of the witnesses' testimony").

The Texas Supreme Court recently clarified the standard of review for factual sufficiency challenges in SPV Act cases. *In re Commitment Stoddard*, 619 S.W.3d at 668.[7] In *In re Commitment of Stoddard*, the Court held that in evaluating factual-sufficiency challenges to the evidence in sexually violent predator cases, an appellate court must "determine whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is a [sexually violent predator]." *Id.* at 668. In doing so,

> [T]he appellate court may not usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony, and the court must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so. If the remaining evidence contrary to the finding is so significant in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that its finding was true, the evidence is factually insufficient to support the verdict.

*Id.*

---

[7] In doing so, the Texas Supreme Court expressly rejected any argument, such as the one made here by the State, that it should follow the Court of Criminal Appeals' approach and abandon factual sufficiency reviews altogether in favor of a single legal-sufficiency standard in SPV Act cases. *In re Commitment of Stoddard*, 619 S.W.3d 665, 667 (Tex. 2020).

**B.    Legal Sufficiency**

Summers argues Dr. Turner's and Dr. Arambula's opinions that he suffers from a behavioral abnormality have no factual basis and are therefore conclusory. "When a scientific opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009); *see also In re Commitment of Manuel*, No. 01-18-00650-CV, 2019 WL 2458986, at *4 (Tex. App.—Houston [1st Dist.] June 13, 2019, no pet.) (mem. op.).  A verdict, however, cannot be sustained on a mere ipse dixit of a credentialed witness. *Pollock*, 284 S.W.3d at 818; *In re Commitment of Manuel*, 2019 WL 2458986, at *4.  "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Pollock*, 284 S.W.3d at 818; *In re Commitment of Manuel*, 2019 WL 2458986, at *4.  Thus, we review the evidence at trial to determine whether Dr. Turner and Dr. Arambula offered a basis for their opinion that Summers suffers from a behavioral abnormality.

Drs. Turner and Arambula each testified at length about the respective methodologies they used to determine whether Summers suffers from a behavioral abnormality.  Dr. Turner, a clinical psychologist, testified that he reviewed several records about Summers, including police reports, prison records, victim statements,

30

and depositions. He also tried to meet with Summers on two separate occasions to conduct a face-to-face interview. Dr. Turner explained that Summers first refused to meet with him, and their second meeting was only marginally more successful. As a result, Dr. Turner based his assessment largely on the records and results of the Static-99R and PCLR tests he administered to Summers using the limited information available to him. Dr. Arambula, a licensed medical doctor who is board certified in general psychiatry and forensic psychiatry, conducted a general psychiatric exam of Summers and a forensic review. He also reviewed the tests administered by Dr. Turner.

Drs. Turner and Arambula each found Summers sexually deviant and antisocial, the two biggest risk factors for reoffending. They also identified the factors they each considered in assessing Summers for a behavioral abnormality and why each factor was important, including that Summers was intoxicated while committing his offenses, offended while on probation and registered as a sex offender, engaged in nonsexual criminal behavior, engaged in grooming behavior, and denied and minimized his offenses. Drs. Turner and Arambula each concluded that Summers had a behavioral abnormality that predisposes him to committing a sexually violent offense. Thus, both experts (1) explained the accepted methodology they employed to formulate their opinions, which is routinely used by experts in their field, (2) offered a basis for their opinions, including their interviews with Summers

31

and review of the records, and (3) explained why the information on which they relied supports their opinions.

Based on the record before us, we conclude that neither Dr. Arambula's nor Dr. Turner's expert opinions that Summers suffers from a behavioral abnormality is conclusory, and therefore, both opinions have probative value. *See Pollock*, 284 S.W.3d at 818; *see also In re Commitment of Day*, 342 S.W.3d at 206 (rejecting argument that expert testimony was conclusory when record reflected that expert offered "a reasoned judgment based upon established research and techniques for his profession").

Summers also argues Drs. Turner and Arambula both highlighted his denial and minimization of his offenses "despite the lack of scientific data supporting any importance to recidivism rates." At most, the record reflects there is a notable disagreement among experts in the relevant field on whether denial of a prior offense is a risk factor for reoffending. The record does not reflect a lack of evidence supporting Dr. Turner's and Dr. Arambula's opinions that denial is a risk factor for reoffending.

Both Dr. Turner and Dr. Arambula acknowledged the divergence of views on the matter. Dr. Arambula explained the nature of the controversy to the jury and why he still considers denial a risk factor. He testified that based on his experience and training in the treatment of sex offenders, "denial is the first roadblock" to

32

successful sex offender treatment. "And all of the treatment studies show that there is a decline in the risk for recidivism once somebody has successfully been treated. And when I see the word successfully treated, that means their denial has gone away. And that's why denial to me is a risk factor."

Summers' denial of his offenses was only one of several factors the experts considered when formulating their opinions in this case. Summers does not dispute there is a factual basis for the other factors identified by Drs. Turner and Arambula, including his pedophilic disorder and antisocial personality, which both experts agree are the two biggest risk factors for reoffending.

Summers contends that Dr. Turner's scoring of the PCLR contained internal contradictions. As the State points out, however, Dr. Turner explained his scoring in detail for the jury, and to the extent there are inconsistencies or contradictions, it was up to the jury to determine how much weight and credibility to attach to the evidence. As the Texas Supreme Court recently admonished, we may not substitute our judgment for that of the jury. *See In re Commitment of Stoddard*, 619 S.W.3d at 668 (reversing appellate court's disposition in SVP Act case in part because court "applied an improper standard that allowed the court to substitute its own judgment for that of a reasonable factfinder"); *see also In re Commitment of Stuteville*, 463 S.W.3d at 552.

33

Summers also argues that Dr. Arambula "considers *any* recidivist sex offender that has not successfully completed treatment to have a behavioral abnormality. This perspective undermines the entire purpose of having a civil commitment trial, which is to assess and determine each accused individual's risk based on evaluation of scientifically analyzed risk factors." This is a mischaracterization of Dr. Arambula's testimony, but even if it were accurate, Summers does not explain how this renders Dr. Arambula's opinion conclusory. At most, this might go to the weight of Dr. Arambula's testimony, but we may not substitute our judgment for that of the jury on that issue. *In re Commitment Stoddard*, 619 S.W.3d at 668.

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Summers suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. To the extent there are conflicts or inconsistencies in the evidence, it was within the province of the jury to weigh the evidence, judge the credibility of the witnesses, and resolve conflicts in the evidence. *See id.*

We therefore hold there is legally sufficient evidence to support the jury's finding that Summers is a repeat sexually violent offender who suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See* TEX. HEALTH & SAFETY CODE § 841.003(a).

## C.    Factual Sufficiency

Relying on the Fort Worth Court of Appeals' opinion in *In re Commitment of Stoddard*, 601 S.W.3d 879 (Tex. App.—Fort Worth 2019), *rev'd*, 619 S.W.3d 665 (Tex. 2020), Summers argues there is factually insufficient evidence supporting his conviction because, while reprehensible, his offenses are not serious enough to qualify him as a "member of the small group of extremely dangerous sex offenders" the SVP Act was enacted to address.  While this appeal was pending, the Texas Supreme Court reversed the court of appeals' opinion in *In re Commitment of Stoddard* holding that the "small but extremely dangerous group" language in the SVP Act's legislative findings upon which the lower court relied is not part of the statute's definition of "sexually violent predator" and therefore not an element the jury had to find.  *In re Commitment Stoddard*, 619 S.W.3d at 677.  We overrule Summers' third issue.

## Improper Jury Argument

In his fourth issue, Summers argues he is entitled to a new trial because the State made an improper closing argument to the jury.

## A.    Standard of Review and Applicable Law

During argument, attorneys may argue the facts of the case to the jury, draw legitimate inferences, deductions, and conclusions from the evidence, discuss the reasonableness of the evidence and its probative effect, and reply to the argument of

35

the opposing party. *Zurita v. Lombana*, 322 S.W.3d 463, 482–83 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *see also* TEX. R. CIV. P. 269(b), (e). To obtain a new trial for improper jury argument, a party must prove (1) the argument was improper, (2) the argument was not invited or provoked, (3) the trial court made an adverse ruling on an objection, requested instruction, or motion for mistrial, (4) the improper argument was not curable, (5) the argument by its nature, degree, and extent constituted reversible error, and (6) the argument had a probable effect on a material finding. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–40 (Tex. 1979); *In re Commitment of Marks*, 230 S.W.3d 241, 247 (Tex. App.—Beaumont 2007, no pet.). Reversal is proper only upon a showing that "the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence." *Standard Fire Ins.*, 584 S.W.2d at 840.

## B.    Analysis

In the State's closing argument, the prosecutor summarized the evidence and discussed how the evidence supported a finding that Summers is a sexually violent predator. The State argued that Summers had pleaded guilty to sexually assaulting a four year-old girl and a six year-old girl in Missouri in 1995, without an admission of guilt, and that after his release from prison for those offenses, he moved to Texas where he reoffended against two other similarly aged girls. Although Summers

36

admitted to touching one of those girls on the vagina over her swimsuit, he denied that the most recent offenses occurred as pleaded. The prosecutor then stated:

> Ladies and gentlemen, Michael Page Summers will not accept responsibility for his action. How many little girls have to pay the price until somebody does something to take responsibility for Mr. Summers? Because he won't do it.

Summers objected that the argument was improper, and the trial court overruled the objection. The prosecutor then concluded his argument:

> Ladies and gentlemen, if Michael Page Summers won't take responsibility somebody has to. Under the laws of our state, that somebody is 12 jurors who have been sworn, who have heard all the evidence. Remember your oath. Follow the evidence. Enforce the law.

Summers argues the prosecutor's statement was improper because he asked the jury to consider the case from an improper viewpoint rather than as a neutral fact finder. *See Beckett v. State*, No. 05-10-00331-CR, 2012 WL 955358, at *6 (Tex. App.—Dallas Mar. 22, 2012, pet. ref'd) (not designated for publication). We disagree with Summers' characterization of the prosecutor's comment. The prosecutor did not ask the jurors to step into the shoes of one of the parties. *Compare Brandley v. State*, 691 S.W.2d 699, 712 (Tex. Crim. App. 1985) (holding that asking jurors to imagine how they would feel if they had lost their daughter was improper argument because it was essentially "plea for abandonment of objectivity"). Rather, the prosecutor asked the jurors to consider the safety and well-being of other similarly aged girls if Summers were released from prison.

37

The opinions in *In re Commitment of Hill*, 621 S.W.3d 336 (Tex. App.—Dallas 2021, no pet.) and *In re Commitment of Eeds*, 254 S.W.3d 555 (Tex. App.—Beaumont 2008, no pet.) are illustrative. In *In re Commitment of Hill*, the State petitioned to have Hill committed under the SVP Act. Hill testified at trial that sex offender treatment is important for people who have committed sex offenses, but he does not need sex offender treatment because he is not a sex offender, and he does not have any triggers for sexually reoffending. 621 S.W.3d at 340. Hill also testified he wanted to work as a counselor after his release from prison because he wants to help people using the knowledge he acquired in his sex offender treatment classes. *Id.*

In closing, the State argued: "In a few minutes, he is released from parole and he feels he has no need to continue sex offender treatment. No need whatsoever. But, yet, he wants to go out and counsel victims. Group setting, one-on-one setting. Can you imagine? Think about this. Think of someone you love who has sexually offended . . . They go to church, get counseling and who is sitting with them alone? Mr. Hill. That's terrifying." *Id.* at 344. Hill argued that the prosecutor's argument improperly asked the jury to consider the case from an improper viewpoint rather than as a neutral fact finder. The court disagreed, holding that because the jury was asked to decide whether Hill had a behavioral abnormality that made him likely to engage in predatory acts of sexual violence, it was "entirely appropriate for the jury

to consider whether" the individuals Hill would like to counsel "will be safe from a predatory act of sexual violence." *Id.* at 345 (quoting *In re Commitment of Eeds*, 254 S.W.3d at 560).

Similarly, in *In re Commitment of Eeds*, the State presented the jury with multiple situations involving Eeds, a convicted sex offender, asking them hypothetical questions such as, "Are you concerned for those girls? Are they safe?" 254 S.W.3d at 560. The court held the trial court did not abuse its discretion in failing to grant a motion for new trial based on a claim of incurable prejudicial jury argument, reasoning:

> The evidence in this case showed that Eeds had been incarcerated for soliciting and for feeling the breasts of little girls in large discount stores and for molesting and keeping photographs of a child he had been babysitting. The jury had to decide if Eeds had a behavioral abnormality that made him likely to engage in a predatory act of sexual violence. Thus, it was entirely appropriate for the jury to consider whether the children Eeds will encounter in stores and homes after his release will be safe from a predatory act of sexual violence.

*Id.*

Summers argues the prosecutor's statement was improper because he asked the jury to punish Summers for "not taking responsibility" for crimes he pleaded guilty to and for which he served time in prison. We disagree. Rather than being a plea to punish Summers or to consider the case from an improper viewpoint, the prosecutor's closing argument was no more than a proper summation of the evidence. Although Summers pleaded guilty to the count of child molestation

against Katie, Summers denied ever fondling Katie's anus or vagina or penetrating her anus with his finger. He also denied ever penetrating her anus with an object. Similarly, although Summers pleaded guilty to one count of statutory sodomy against Carrie, he denied ever penetrating Carrie's anus or vagina with his finger. The jury also heard evidence from Drs. Arambula and Turner that Summers denied or minimized some of his prior offenses.

Thus, as the State points out, the record reflects there was evidence that "two little girls paid the price, nobody took responsibility, and then two more girls paid the price." We conclude that the State's closing argument was a summation of the evidence before the jury, and that it was not improper. *See In re Commitment of Lovings*, No. 09-13-00024-CV, 2013 WL 5658426, at *2 (Tex. App.—Beaumont Oct. 17, 2013, no pet.) (mem. op.) (holding State's reiteration of facts from records and allegations in witness statements was proper summation of evidence, even though those records were not in evidence because expert had testified that she had reviewed and relied upon these facts and allegations in forming her opinion).

Even if the State's argument were improper, the record contains sufficient evidence from which the jury reasonably could conclude that Summers is a sexually violent predator. *See Standard Fire Ins.*, 584 S.W.2d at 840 (stating reversal is proper only upon showing that "the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper

40

proceedings and evidence"). We cannot say that the complained-of argument probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a); *In re Commitment of Ramirez*, No. 09-13-00176-CV, 2013 WL 5658597, at *7 (Tex. App.—Beaumont Oct. 17, 2013, no pet.) (mem. op.).

We overrule Summers' fourth issue.

## Conclusion

We affirm the trial court's order of commitment.


Veronica Rivas-Molloy
Justice

Panel consists of Justices Goodman, Hightower, and Rivas-Molloy.

41